U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED - SHREVEPORT

SEP 3 0 2008

ROBERT H. SHEMWELL, CLERK
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF LOUISIANA

# SHREVEPORT DIVISION

| | |
|---|---|
| LORNA STUKA | CIVIL ACTION NO. 06-1527 |
| versus | |
| METROPOLITAN LIFE INSURANCE COMPANY and PENNZOIL-QUAKER STATE COMPANY | JUDGE DONALD WALTER |

## MEMORANDUM OPINION

Before the court is a Motion for Decision on Stipulated Record filed by plaintiff, Lorna Stuka. *See* Record Documents 15 and 16. For the reasons set forth below, this court finds that there is substantial evidence to support the termination of Ms. Stuka's long-term disability benefits.

## I. Background

The parties have stipulated to the facts of this case and only legal issues remain in dispute. Defendant Pennzoil-Quaker State Company ("Pennzoil") established an employee welfare benefit plan ("the Plan") that included, among other things, a long term disability ("LTD") benefit plan to employees of Pennzoil. *See* Record Document 15. The Plan is an "employee welfare benefit plan" as defined by the Employee Retirement Income Security Act of 1974, as amended, ("ERISA"), 29 U.S.C. § 1001-1461.[1] Defendant Metropolitan Life Insurance Company ("Metlife") issued a group

---

[1] An employee welfare benefit plan is "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the

1

policy of insurance to insure the Plan. Metlife is the claim administrator for the plan. *See* Record Document 15.

The Pennzoil Long-Term Disability plan defines "total disability" as follows:

**Definition of Disability**
For the first 24 months of disability, you are considered disabled if you cannot perform all the material duties of your regular job. After you receive disability benefits for 24 months, you are considered disabled if a disability prevents you from earning more than 80% of your pre-disability income in any occupation for which your education, training or experience qualifies you.

*See* Ex. B, p.135.[2]

A period of total disability begins on the first day the employee is totally disabled. The period of total disability ends on the earliest of the following occurrences:

- The date you cease to be totally disabled
- The date you start work at a reasonable occupation for which you are compensated
- The date you fail to give proof that you are still totally disabled
- The date you refuse to be examined
- The date you cease to be under the care of a physician
- The date you reach the expiration of the maximum benefit period shown in *Duration Of Benefits*
- The date you do not meet eligibility requirements
- The date your employment with the company terminates
- The date of your death
- The date after the claims administrator determines you are able to participate in an approved rehabilitation program, as described below, and you refuse to do so

*Id.* at 137.

The Plan further provides:

---

purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, death, or unemployment . . . ." 29 U.S.C. § 1002(1).

[2]The Exhibits cited in this opinion refer to the exhibits attached to Record Document 15.

2

**Certification**
If your doctor believes you are not able to return to work after receiving STD benefits for six months, the claims administrator may request additional medical documentation from your doctor. On its receipt, the claims administrator reviews the documentation and determines if you qualify for long term disability benefits. You may be required to undergo a medical examination as often as reasonably needed.

*Id.* at 136.

At all relevant times, Plaintiff Lorna Stuka ("Stuka") was employed by defendant Pennzoil and was thus eligible to and did participate in the plan. In 1986, Stuka had to undergo surgery, which included a craniotomy for a right frontal brain abscess and obliteration of the right frontal sinus. *See* Record Document 15, p.4; Ex. A, p.699; Record Document 18, p.11. Following surgery, she developed severe complications and became disabled, which prevented her from returning to work.

Metlife paid Stuka long term disability benefits until 2005, when Metlife terminated the long term disability benefits.[3] *See* Record Document 17. In a letter dated April 18, 2005, Metlife stated: "[W]e have determined medical documentation does not support the existence of a totally disabling condition preventing you from performing your own occupation." *See* Exhibit A, p.120. Stuka appealed the decision to deny long term disability benefits, but Metlife upheld the decision on review.[4] *See* Record Document 15. Stuka exhausted her administrative remedies and timely filed

---

[3]Metlife suspended Stuka's benefits in 2001, but in August 2002, the benefits were reinstated retroactive to December 2001.

[4]On June 6, 2005, Stuka appealed the decision to deny long term disability benefits. By letter dated June 29, 2005, Metlife informed Stuka that its decision was upheld. On December 14, 2005, Metlife advised Stuka that, through her counsel, she could file a second appeal and any new information submitted by January 27, 2006 would be considered. Stuka did not submit any further documentation between December 14, 2005 and January 27, 2006. Metlife did not render a formal decision after the second appeal, but the claim is deemed denied on review. *See* Record Document 18.

suit in the Western District of Louisiana. *Id.*

## II. Standard of Review

The parties have stipulated that the Plan is an employee welfare benefit plan governed by ERISA. Generally, a denial of benefits under an ERISA plan is reviewed under a *de novo* standard. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956 (1989). However, the court applies an abuse-of-discretion standard when "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S. Ct. at 956-57. The Plan provides that "[t]he plan administrator (or its designee as it relates to functions delegated by the plan administrator) has complete and final discretionary authority to interpret the plans and maintain control over the operation and administration of the plans." Record Document 15. Further, "[a]ll decisions concerning the payment of claims under the plan are at the sole discretion of the claims administrator." *Id.* Thus, abuse-of-discretion is the appropriate standard of review in this case.

In reviewing for abuse of discretion, the court must consider whether the decision was arbitrary or capricious. *Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 601 (5th Cir. 1994). A decision is arbitrary or capricious only if "made without a rational connection between the known facts and the decision or between the found facts and the evidence." *Meditrust Fin. Servs. Corp. v. Sterling Chemicals, Inc.*, 168 F.3d 211, 215 (5th Cir. 1999) (quoting *Bellaire Gen. Hosp. v. Blue Cross Blue Shield*, 97 F.3d 822, 828-29 (5th Cir. 1996)). When determining whether the plan administrator's determination was an abuse of discretion, the court's review is confined to the record available to the administrator at the time the claim was denied. *Id.*

Utilizing this standard of review, the court can reverse the plan administrator's decision only

4

in the absence of substantial evidence to support a plan administrator's decision. "Substantial evidence" is defined as "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Weary v. Astrue*, 2008 WL 3820989, 4 (5th Cir. 2008) (citing *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

### III. Analysis

As discussed above, the Court need only determine if Metlife's decision to terminate Lorna Stuka's disability benefits was arbitrary and capricious. Plaintiff Stuka argues that there has been no change in her medical condition since 1986, thus there is no reason to terminate her benefits at this time. However, Metlife claims it was justified in its decision because the medical documentation no longer supported the existence of a totally disabling condition. *See* Record Document 18, p.15; Exhibit B, p.119-121.

After a thorough review of the record, this Court is unable to say that there was no "rational connection between the known facts and the decision." *See Meditrust Fin. Servs. Corp. v. Sterling Chemicals, Inc.*, 168 F.3d 211, 215 (5th Cir. 1999). Rather, the Court agrees with Defendant Metlife that there is an absence of objective medical documentation supporting a total disability claim.

Specifically, Stuka first received long term disability benefits following surgery on the right frontal lobe of her brain. *See* Record Document 15. Stuka began taking Dilantin to prevent seizures and was advised to continue this medication on a permanent basis. No seizure activity was documented until March of 1994 when Dr. William Giddens noted that he spoke to Dr. Winston Brown regarding Stuka having a recurrent seizure. Exhibit A, p.857. Thus, the first instance of any reported seizure activity occurred nearly eight years after Stuka became "totally disabled." On July 6, 1995, Dr. Giddens noted that Stuka had "no seizures in years" and that she was continuing

Dilantin. *Id.*

No other seizure activity is documented until February 26, 2002, when Stuka reported to her treating physician, Dr. Indira Sastry, that she had "two spells where she might have had seizures." Exhibit A, p.681. But Dr. Sastry noted that after "further questioning the patient [said] that she had quit taking her Dilantin as she thought she need not take it any longer... For some reason she thought that she was cured of her seizure disorder and therefore quit taking the medication." *Id.* On August 18, 2004, Stuka reported to Dr. Sastry that she had fallen when she was shopping, but she was "not sure if she had a seizure." *Id.* at 135. And on October 20, 2004, Stuka informed Dr. Sastry that a friend had found her lying on the ground outside one day, but again "[s]he is not sure whether there was loss of consciousness or whether she had an episode with seizures." *Id.* at 136.

In the 19 years from which Stuka was disabled until the termination of her long term disability benefits, the objective medical documentation shows only one incident of recurrent seizure activity, two "spells" when she stopped taking Dilantin,[5] and only two incidents of possible seizure activity. With respect to those two potential incidents, there are no objective test results in the record indicating the events were related to seizures.

On January 20, 2005, Dr. Mary Elise McWilliams, board certified in neurology, examined Stuka and informed Metlife that the "[p]atient has no evidence on EEG of epilepsy of any type." *Id.* at 730. Further,

> Constructional praxis testing reveals worse performance on the intermediately difficult portion of the test and better performance on the hardest portion. In other words she is able to copy the most complex figure better than the second easiest task and as well as the easiest figure. This is more typical of a patient who is trying to

---

[5] "The seizure disorder appears to be controlled as long as LS takes Dilantin as ordered by her physician." Exhibit A, p.857 (5/7/02 Summary).

fake the test bad than a patient with an actual right parietal lobe lesion.

*Id.*

Dr. Williams did acknowledge that Stuka had both orthopedic and cognitive limitations on her ability to work. And although her cognitive skills seemed to have improved, Dr. Williams was "not convinced that she is able to work. Formal cognitive testing would be the only means of deciding if she is still disabled." *Id.* at 731. But she goes on to say that Stuka "is functioning in the low end of normal as far as I can tell by her clinical testing of function. There is no evidence of epilepsy on her current medications. She has no recent history of a witnessed seizure." *Id.* And in a letter written on January 28, 2005, Dr. Williams stated "[t]his patient is 53 and has no EEG evidence of epilepsy or encephalophatic processes other than medication effects."

Stuka has also suffered from recurrent sinus infections, bronchitis, and exacerbations of asthma, but there is no evidence that these conditions cause her to be unable to work. Rather, these conditions have not been severe and have been treated conservatively with antibiotics and steroids. *See* Exhibit A, p.857. In May 2002, Metlife retained Dr. Robert Conte to provide an independent medical opinion. Dr. Conte found there was "no evidence of any further medical problems related to the surgery" and "[a]lthough she claims she has head swelling there is no evidence to that effect." *Id.* at 699. In fact, Dr. Conte reported that he personally spoke "with her physician who could find no reason as to why Ms. Stuka should not be working. The doctor states she has expressed this idea to Ms. Stuka who was opposed to it." *Id.*

With the absence of objective medical documentation indicating that Stuka was suffering from a totally disabling condition, Metlife's decision to terminate Stuka's long term disability benefits was not arbitrary and capricious. Even after the initial decision to terminate was made,

7

Stuka failed to provide the plan administrator with any objective medical documentation indicating that she suffers from a totally disabling condition preventing her from performing every duty of her regular occupation. In fact, in 2001, Stuka admitted that she is able to do laundry, wash dishes, vacuum and do other household chores on a regular basis. *See* Exhibit A, p.643-47 (Personal Profile).

On appeal and before this Court, Stuka argues that her treating physician, Dr. Sastry, has written (and continues to write) numerous letters stating that Ms. Stuka is disabled. *See e.g.* Exhibit A, p.33, 42. However, in *Vercher v. Alexander & Alexander Inc.*, the Fifth Circuit stated that "ERISA does not require plan administrators to accord special deference to opinions of treating physicians." 379 F.3d 222, 233 (5th Cir. 2004). Quoting the Supreme Court, the Fifth Circuit stated:

> "[P]lan administrators may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."

*Id.* (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 123 S.Ct. 1965, 1966-67 (2003).

After Ms. Stuka appealed Metlife's decision to terminate her benefits, Metlife subsequently obtained the opinion of two independent consulting physicians, Dr. Joseph Jares, III, board certified in neurology, and Dr. Leonard Sonne, board certified in internal medicine and pulmonology. Dr. Jares noted that "[t]here are no objective neurological tests submitted such as an MRI or EEG. There is no formal neuropsychological testing submitted. There is no brain imaging studies submitted." Exhibit A, p.764 (6/27/05 Assessment). As a result, there was "insufficient data" for Dr. Jares to assess Ms. Stuka's functional limitations. *Id.* at 765.

8

From a pulmonology perspective, Dr. Sonne found that Ms. Stuka is "fully functional." Exhibit A, p.768 (6/27/05 Assessment). He provides in his report:

> Post surgery, she was placed on Dilantin as a precaution. There is no documentation of recurrent seizures. There is no documentation of severe asthma. She has had mild asthma. Asthmatic attacks are mild in nature even when she has some. The respiratory rate is normal. Pulse indicates to be normal. They are punctuated and caused by episodes of sinusitis with postnasal drip or bronchitis. She usually has an episode couple times a year. The records indicate when she is treated for that, she is in no distress. She has had a normal exercise study in 2002. There is no documented objective evidence of limitations, restrictions, or impairments.

*Id.*

Pennzoil's long-term disability plan specifically provides for termination in the event an employee "fail[s] to give proof that you are still totally disabled." *See* Exhibit B, p.137. Neither of the independent consultants found that Ms. Stuka was suffering from a totally disabling condition, or more importantly, that she had provided proof of such condition.

## IV. CONCLUSION

In the absence of any objective medical documentation, and based on the majority of subjective medical opinions, Metlife decision to terminate Stuka's benefits was based on substantial evidence. Therefore, applying the standards set forth above, the court finds that Metlife did not abuse its discretion in denying Ms. Stuka long-term disability benefits under the Plan.

**THUS DONE AND SIGNED** at Shreveport, Louisiana, this 30 day of September, 2008.

DONALD E. WALTER
UNITED STATES DISTRICT JUDGE

9